UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

| | |
|---|---|
| BORDER NETWORK FOR HUMAN RIGHTS, MIRANDA LOPEZ, JAVIER MORENO, REBECCA MORENO, VANESSA MARTINEZ, JAIME SOTO, JESSICA RUIZ, ALICIA RUIZ, PEDRO SALAS, and NATALIA VARGAS and JORGE GARCIA, for themselves and their minor children, MARIA GARCIA, VICTOR GARCIA, and ELVIRA GARCIA,[1] <br><br>Plaintiffs, <br>v. <br><br>COUNTY of OTERO, NEW MEXICO, DEPUTY JASON GREEN, DEPUTY ROB HANSEN, and SEVERAL UNNAMED OTERO COUNTY SHERIFF'S DEPUTIES, <br><br>Defendants. | CIVIL ACTION NO. <br><br>_____ <br><br><br><br><br><br><br><br><u>**JURY TRIAL DEMANDED**</u> |

### **PLAINTIFFS' COMPLAINT FOR DAMAGES TO REMEDY CIVIL RIGHTS VIOLATIONS AND COMMON LAW TORTS**

Plaintiffs Border Network for Human Rights, Inc., Miranda Lopez, Javier Moreno, Rebecca Moreno, Vanessa Martinez, Jaime Soto, Jessica Ruiz, Alicia Ruiz, Pedro Salas, and Natalia Vargas and Jorge Garcia, for themselves and their minor children, Maria Garcia, Victor Garcia, and Elvira Garcia file this Complaint, and would show:

STATEMENT OF CLAIM

1. Plaintiffs bring this civil action for declaratory and monetary relief, seeking redress from Defendants for the deprivation of Plaintiffs' constitutional rights under color of law and in violation of the Fourth and Fourteenth Amendments to the United States Constitution. Plaintiffs

---

[1] Plaintiffs have assumed pseudonyms for reasons of privacy and to protect their families and neighbors from retaliation. They are known to Defendants as described below.

also bring forward supplemental claims for constitutional violations and tortious acts under New Mexico law.

## JURISDICTION AND VENUE

2. This action is brought pursuant to 28 U.S.C. § 1331 and 42 U.S.C. §§ 1983 and 1988. Plaintiffs also invoke the supplemental jurisdiction of this Court, pursuant to 28 U.S.C. § 1367(a), to hear their state law claims against Defendants. The events which gave rise to this lawsuit occurred within this District making venue proper pursuant to 28 U.S.C. § 1391.

## PARTIES

3. Plaintiff Border Network for Human Rights is a grass roots organization whose mission is to educate border communities regarding civil and human rights with a particular focus on immigrants, and to support especially immigrant communities in organizing to assert their rights. It focuses much of its community outreach and organizing efforts in southern New Mexico, including Otero County. A significant portion of its membership resides in Otero County. It brings suit in its representational capacity, on behalf of its members whose rights have been violated by Defendants and whose rights could be violated if Defendants are permitted to continue their policy of racial and ethnic profiling and unreasonable searches and seizures. All of the individually-named Plaintiffs are members of Border Network for Human Rights.

4. Plaintiffs Miranda Lopez, Javier Moreno, Rebecca Moreno, Vanessa Martinez, and Jaime Soto are adult residents of Otero County. They are all of Hispanic descent.

5. Plaintiffs Jessica Ruiz, Alicia Ruiz, Pedro Salas, and Natalia Vargas and Jorge Garcia and their minor children, Maria Garcia, Victor Garcia, and Elvira Garcia currently reside in Ciudad Juárez, Chihuahua, Mexico. They were all residents of Otero County when the incidents giving rise to this complaint occurred. They are all of Hispanic descent.

6. Otero County is a political subdivision within the State of New Mexico. At all relevant times, Otero County employed the deputies described in this complaint. Otero County may be served process by serving County Clerk Robyn Holmes, 1000 New York Avenue, Rm. 108, Alamogordo, New Mexico 88310.

7. At all relevant times, Defendants Green and Hansen as well as the Unnamed Otero County Sheriff's Deputies were employed by Otero County, and, as such, were responsible for upholding the laws of the United States and New Mexico and acting as the agents, servants, and employees of Defendant County. Defendants Green and Hansen and the Unnamed Otero County Sheriff's Deputies are sued in their individual and official capacities. Defendants Green and Hansen and the Unnamed Otero County Sheriff's Deputies may be served with process at Otero County Sheriff's Department, 3208 N. White Sands Blvd., Alamogordo, New Mexico 88310. Although the names of all of the Deputies involved in the incidents giving rise to this suit are not known at this time, they will be identified as litigation and discovery proceed.

8. At all relevant times, the deputies described herein were employed by Otero County as Deputy Sheriff's Officers. In their actions described herein, the deputies were acting under color of law and pursuant to official policy and custom of Otero County and implementing a county program known as "Operation Stonegarden."

## STATEMENT OF FACTS

9. The staff of Plaintiff organization Border Network for Human Rights has been receiving reports of harassment by Otero County Sheriff's Department against Otero County residents and members of Border Network for Human Rights who appear to be of Hispanic descent since January of 2007.

10. However, the habitual harassment of Otero County's Hispanic residents advanced to a new and unconscionable level this summer when Defendants began targeting Hispanic families in their own homes by initiating random sweeps of trailers in the area. In so doing, Defendants tossed the Bill of Rights and the Constitution of the State of New Mexico aside and crossed the threshold into the realm of constitutional impermissibility.

11. Some of the earliest examples of Defendants' shocking disregard for Plaintiffs' civil rights were reported in July.

12. One evening on or about July 9, 2007, Plaintiffs Javier and Rebecca Moreno were enjoying a quiet evening at home. Rebecca is a U.S. Citizen and Javier is a Legal Permanent Resident. Rebecca was in her living room and Javier was taking a shower when someone knocked on the door.

13. Rebecca opened the door to find Defendant Green standing with his hand already on his gun.

14. Defendant Green told Rebecca he was looking for "Tony."

15. Rebecca informed him that no one by that name lived there; she purchased the trailer several months earlier.

16. Defendant Green turned to go and Rebecca began closing the door.

17. At that moment, Javier Moreno emerged from the bathroom where he had been showering.

18. Defendant Green immediately forced the half-closed door open, pushing past Rebecca and into the home.

19. On information and belief, Defendant Green did not have a warrant to enter the home or to arrest "Tony."

20.  Defendant Green screamed at Rebecca with his hand still poised on his gun, "I thought he wasn't here.  Let me see your I.D."

21.  Rebecca said "That's not "Tony."  That's my husband, Javier."

22.  Unsure why Defendant Green needed to see her I.D. since she undoubtedly was not "Tony," Rebecca nevertheless produced her driver's license.

23.  Next, Defendant Green demanded to see Javier's I.D.

24.  Javier informed Defendant Green that his I.D. was in the bedroom.

25.  Defendant Green followed Javier and shoved him down the hallway leading to the bedroom.

26.  Javier produced his driver's license.

27.  When Defendant Green returned to the living room he yelled at Rebecca, "I could have you arrested for hiding your husband."

28.  "But you didn't ask for him.  You asked for Tony," she replied.

29.  "Next time I will have you arrested," he threatened, his hand still on his gun.

30.  Defendant Green entered the Moreno home without consent or a warrant and in the absence of exigent circumstances.  His presence and demeanor frightened Plaintiffs and because they were already in their own home, they felt they could not leave or refuse to answer his questions.

31.  More examples of Defendants' custom and policy of ethnic and racial profiling and disregard for the protections of the Fourth Amendment occurred in August 2007.

32.  The afternoon of August 8, 2007, Plaintiff Alicia Ruiz was at home in her trailer talking to her sister Plaintiff Vanessa Martinez and her mother Plaintiff Jessica Ruiz.

33. When Vanessa left the trailer she noticed two Otero County Sheriff's deputies approaching the home.

34. One of the deputies asked Vanessa if she had "papers."

35. Vanessa responded that she had "papers" but she did not have them with her.

36. Hearing voices in their yard, Alicia and Jessica went outside to investigate.

37. One of the deputies told Alicia and Jessica that they had a report that "illegals" were "hiding in trailers." They did not indicate that the report specified Plaintiffs' trailer.

38. When the deputies arrived Plaintiff Jaime Soto, Plaintiff Alicia Ruiz's son, was talking to his neighbor in the adjacent yard.

39. When Jaime saw the deputies approach his aunt, mother, and grandmother, he returned to his own yard to see what was going on.

40. When Jaime joined his family one of the deputies asked for his name. Jaime told the deputy his name, but refused the deputy's command to produce his I.D.

41. The deputy asked Jaime, "Are you American?" Jaime replied that he is.

42. Then one of the deputies asked Plaintiffs Alicia and Jessica Ruiz for their I.D.s.

43. Alicia produced a New Mexico I.D. and Jessica produced a Texas I.D.

44. After Plaintiffs showed their I.D.s the deputies moved on to a neighboring trailer where another Hispanic family resided.

45. Plaintiffs saw the deputies take a man and his two children away.

46. Meanwhile, Alicia, Jessica, and Jaime went inside.

47. Several minutes later the deputies returned to the Ruiz-Soto home, entering Plaintiffs' home without knocking.

48. Jaime said, "No. You cannot come in my house. You have to show me a report [warrant]."

49. On information and belief the deputies did not have a warrant to enter Plaintiffs' home or arrest any of their family members. They did not have Plaintiffs' consent to enter, nor were there exigent circumstances at the scene.

50. Jaime demanded, "Show me your report [warrant]."

51. The deputies refused to show Jaime a warrant or evidence that they had received a report about their trailer.

52. Having barged into Plaintiffs' home without warning, consent, or legal authority, and despite their ability to produce valid identification, the deputies yelled at Alicia and Jessica "Show me your papers! Are you Americans? What are your social security numbers?"

53. Alicia and Jessica admitted they did not have "papers."

54. Along with their neighbor and his children, Alicia and Jessica were taken away by three U.S. Border Patrol agents waiting nearby.

55. As Alicia and Jessica were taken away, Plaintiff Vanessa Martinez returned to the Ruiz-Soto home to make sure Alicia's children were taken care of. As she approached, one of the deputies again asked her whether she had "papers."

56. In the days immediately following their invasion of the Ruiz-Soto home, Defendants continued terrorizing Hispanic families around Otero County.

57. On the morning of August 8, 2007, Plaintiff Pedro Salas was at home looking after his young children while his wife was at work when he heard a knock on his door.

58. When he opened the door an Otero County Sheriff's deputy was standing on his porch.

59. The deputy said, "I heard there were illegals hiding in trailers."

60. Pedro said, "No. There aren't many around here."

61. Pedro could see a U.S. Border Patrol truck parked on the street near by.

62. The deputy forced his way into Pedro's home without permission or legal authority. He called the Border Patrol agents waiting outside on his cell phone.

63. Once inside, the deputy asked to see Pedro's I.D. Pedro responded that he did not have an I.D., but he was married. He produced his marriage certificate and birth certificate to confirm his identity.

64. The deputy then asked Pedro for his social security number.

65. When the Border Patrol agents arrived they too entered the home without permission.

66. While the deputy and agents waited for Pedro's wife to return home to take charge of the children, his neighbor came over to see what the commotion was about.

67. Pedro's neighbor is an Anglo woman who is a teacher in the local schools, but she too lives in a trailer in Otero County. The deputy told her that "they were having trouble with drugs."

68. No drugs were found on Plaintiff's property, nor were any drug-related charges brought against Plaintiff.

69. Once again, Defendants burst into a Hispanic family's home without a warrant or evidence of criminal conduct. This time, however, they added insult to injury by slandering Plaintiff and his family to their neighbor.

70. Just before midnight on that same day, Plaintiff Miranda Lopez was in her home with her family. Her sister was on her way over with her niece.

71. About this time, Defendants Green and Hansen arrived at Miranda's house and knocked on the door.

72. When Miranda opened the door Defendants claimed someone had called 911 and they asked to come in.

73. Miranda said no one called 911; she knew because she had been sitting in the living room where the telephone is located all evening.

74. Just then Miranda's sister arrived.

75. As Plaintiff's sister and niece entered, Defendants Green and Hansen pushed their way into Miranda's home without permission.

76. Defendants Green and Hansen began searching around the trailer.

77. "What are you looking for?" asked Miranda. Defendants refused to answer her questions.

78. Although Plaintiff's home is a small trailer, the two Defendants did not leave until around 1:30 a.m. after an hour and a half of searching and refusing to answer Plaintiff's questions.

79. On information and belief Defendants did not have a warrant or other legal authority to enter or search Plaintiff's home.

80. The next morning, August 9, 2007, Miranda returned home from running errands with her children at about eleven a.m.

81. As she went up the steps to her front door, an Otero County Sheriff's patrol car pulled up.

82. Defendants Green and Hansen got out of the car and came up onto Miranda's porch. Defendants immediately asked for her I.D.

83. Miranda asked Defendants what they were looking for, but again, they refused to answer.

84. One of the Defendants asked, "Are you illegal?"

85. Miranda produced her driver's license.

86. At this point Miranda's sister came out of the trailer and Defendants asked for her "papers."

87. Plaintiff's sister produced her driver's license as well.

88. Once the deputies verified Miranda's license, Defendants asked for her social security number.

89. Plaintiff admitted she didn't have a social security number.

90. Defendants called the U.S. Border Patrol whose agents were apparently waiting nearby.

91. Defendants would not answer any of Plaintiff's questions or explain why they had come to her home two days in a row to harass her family.

92. Defendants' utter disregard for Plaintiffs' civil rights continued throughout the summer, and Border Network for Human Rights continued to receive complaints from their members varying from harassment to home invasions like those described above.

93. Like all the other named Plaintiffs, on September 10, 2007, Jorge Garcia was enjoying a normal morning at home with his children when Otero County Sheriff's Deputies came to his door.

94. The deputies asked him if he knew who the stray dogs running around neighborhood belonged to. Jorge and one of his children said they were not their dogs and they didn't know whose they were.

95. The deputies left. The dogs were taken away in what appeared to be an animal control truck.

96. Several hours later the deputies returned.

97. Jorge's children were playing on the porch when the deputies asked one of them to go get Jorge.

98. When Jorge came to the door the deputies asked him about the stray dogs again.

99. Jorge responded that he had already told them they weren't his dogs and the dogs were already gone.

100. Without warning, the deputies asked for Jorge's I.D.

101. Jorge produced his driver's license.

102. Not satisfied, Defendants demanded to see his social security card as well.

103. Hearing strange voices, Jorge's wife, Plaintiff Natalia Vargas, came to the door.

104. The deputies asked her for her I.D. as well.

105. Jorge could not produce a social security card and Natalia did not have an I.D.

106. When Plaintiffs could not produce the requested documents, one of the deputies muttered, "Go back to your country."

107. The deputies summoned U.S. Border Patrol agents who again were apparently waiting near by.

108. When Jorge's sister-in-law arrived to take Plaintiffs' three U.S. Citizen children, Maria, Victor, and Elvira Garcia, the deputies assaulted her with questions: "Where are you from? What is your name?"

109. Plaintiff's sister-in-law replied that she is an American Citizen and she came to take the Citizen children.

110. Instead, the deputies insisted that the U.S. Citizen children accompany Natalia to detention and eventually to Juárez despite the fact that their U.S. Citizen aunt was there to care for them.

111. In so doing, the deputies violated the children's right to remain in their country of origin and violated their parents' right to decide the best interest of their own children.

112. Acting without probable cause, reasonable suspicion, or legal justification, the deputies conducted their activities, described above, according to a program of the County, Operation Stonegarden. Moreover, the deputies engaged in illegal racial and ethnic profiling, and also apparently sought to enforce federal civil immigration laws without legal authority to do so.

113. There are any number of such unlawful searches and seizures conducted as part of the County's Operation Stonegarden in Otero County that use pretext to try to enforce federal civil immigration laws or apprehend undocumented immigrants, without legal authority to do so.

114. Operation Stonegarden is implemented by the Otero County Sheriff, who, for purposes of the law, is the same as Otero County. Moreover, the County allows the implementation of Operation Stonegarden, thereby ratifying it.

## CAUSES OF ACTION

### I. Unreasonable Search and Seizure

115. The deputies' actions, stated above, violated Plaintiffs' rights under the Fourth Amendment to the United States Constitution and Article II Sec. 10 of the New Mexico State Constitution.

116. The deputies' actions, done under color of law and official authority and pursuant to official policy and custom, deprived Plaintiffs of their right to be free from unlawful search and seizure, and detained them without legal justification.

117. On information and belief, Defendant Otero County and its officials, as a matter of custom and policy, acting with deliberate, conscious and callous indifference to the right to be free from unlawful search and seizure and illegal detention, authorized, tolerated, and institutionalized the practices and ratified the legal misconduct, described herein, as part of Operation Stonegarden, proximately causing Plaintiffs the deprivation of their rights.

## II. Racial and Ethnic Profiling

118. The deputies' actions, stated above, violated Plaintiffs' rights under the Fourteenth Amendment to the United States Constitution and Article II Sec. 18 of the New Mexico State Constitution.

119. The deputies' actions, done under color of law and official authority and pursuant to official policy and custom, deprived Plaintiffs of their right to equal protection of the law and their right to be free from illegal racial and ethnic profiling and from discrimination on the basis of race or national origin.

120. On information and belief, Defendant Otero County and its officials, as a matter of custom and policy, acting with deliberate, conscious and callous indifference to the right to equal protection of the law and to be free from illegal racial and ethnic profiling and from discrimination on the basis of race or national origin, authorized, tolerated, and institutionalized the practices and ratified the misconduct, described herein, as part of Operation Stonegarden, proximately causing Plaintiffs the deprivation of their rights.

## III. Due Process

121.  With respect to the U.S. Citizen minor children only, the deputies' actions, stated above, violated Plaintiffs' rights under the Fourteenth Amendment to the United States Constitution and Article II Sec. 18 of the New Mexico State Constitution.

122.  Preventing three U.S. Citizens from remaining in their country of origin with their family, done under color of law and official authority and in violation of official policy and custom, deprived Plaintiffs of their right to due process of law.

123.  On information and belief, the unknown Defendant deputies who prevented the Garcia children from staying with their aunt, acting with deliberate, conscious and callous indifference to their rights deprived them of due process of law.

## IV.  Civil Conspiracy

124.  The Defendant deputies, as described above, conspired to apprehend Otero County residents who they perceived to be undocumented immigrants based on illegal racial and ethnic profiling of Hispanic families generally, especially those who reside in the innumerable trailers in Otero County.

125.  The Defendant deputies, as described above, repeatedly targeted Hispanic families in Otero County including Plaintiffs by confronting them at their homes without reasonable suspicion or any evidence of criminal conduct other than Plaintiffs' race or ethnicity and Defendants' assumptions about their national origin.

125.  The Defendant deputies, as described above, repeatedly forced their way into Plaintiffs' homes without warrants, exigent circumstances, or other legal authority such as evidence of criminal conduct.

126.  The Defendant deputies, as described above, illegally searched Plaintiffs' homes and seized Plaintiffs when their presence in Plaintiffs' homes and demeanor prevented Plaintiffs from leaving or refusing to answer Defendants questions.

127.  Plaintiffs' have been damaged as a result of the wrongful acts Defendant deputies conspired to commit.

128.  Violations of Plaintiffs' constitutional rights are damaging to Plaintiffs in and of themselves, but Plaintiffs have also incurred legal costs and other expenses related to the separation of their families.

### V.  State Tort Claims

129.  Defendants' entry and search of Plaintiffs' homes constitutes trespass.

130.  With respect to the U.S. Citizen minor children, Defendants' detention of Plaintiffs and insistence that they accompany their mother to detention and through deportation despite their parents' desire that they stay in the U.S. with their aunt, constitutes false arrest and false imprisonment.

131.  The actions of Defendants were not justified or privileged under state law.

### DAMAGES

132.  Plaintiffs seek reasonable compensatory and nominal damages against Defendants for violations of their Fourth and Fourteenth Amendment rights as well as their rights under state law.

### PUNITIVE DAMAGES

133.  Because of the willful, wanton, and malicious nature of their actions, undertaken against Plaintiffs, in utter disregard for their rights, Plaintiffs, each claim punitive damages

against Defendants Green and the as yet unknown Otero County Sheriff's Deputies in their individual capacities for their violations of Plaintiffs federal rights.

## ATTORNEYS' FEES

134. Plaintiffs are entitled to recover attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

## DECLARATORY RELIEF

135. This suit involves an actual controversy within the Court's jurisdiction, and the Court may declare the rights of Plaintiffs under the Constitution and laws of the United States, and grant such relief as necessary and proper.

## INJUNCTIVE RELIEF

136. Because Plaintiffs and other individuals of Hispanic descent will continue to experience arbitrary and unlawful searches and seizures as well as illegal racial and ethnic profiling and discrimination on the basis of race and national origin as part of Otero County's Operation Stonegarden program, temporary and permanent injunctive relief is necessary to stop such unlawful activity. This is especially true given the Sheriff's announcement to the press on or about September 17, 2007, that he has plans for more Operation Stonegarden raids in the future.

137. Plaintiffs will suffer irreparable harm, not compensable in monetary damages, if injunctive relief is not granted.

138. Plaintiffs have shown the Court the likelihood of success on the merits of their claim.

## PRAYER FOR RELIEF

Therefore, Plaintiffs respectfully pray that this Court:

A. Enter declaratory judgment that Defendant Otero County and its officials, as a matter of custom and policy, acting with deliberate, conscious and callous indifference to Plaintiffs' right to be free from unreasonable search and seizure, authorized, tolerated, and institutionalized the practices and policies behind Operation Stonegarden, and ratified the illegal misconduct herein detailed;

B. Enter judgment on behalf of Plaintiffs against Defendants for reasonable actual and nominal damages sufficient to compensate him for the violation of his Fourth, Fifth, and Fourteenth Amendment rights;

C. Order injunctive relief requiring Defendants, its agents, servants, and employees, and all persons acting in concert with Defendant, to immediately halt its Operation Stonegarden program;

E. Order Defendants to pay Plaintiffs' attorneys' fees and costs; and

F. Grant all other and additional relief to which Plaintiffs may be entitled in this action, at law or in equity.

Dated: October 17, 2007

Respectfully submitted,

 /s/ Olga Pedroza
Olga Pedroza
New Mexico State Bar No. 4630

Olga Pedroza, Esq.
P.O. Box 6342
Las Cruces, New Mexico 88006
  505-647-0472 (phone)

*and*

PASO DEL NORTE CIVIL RIGHTS PROJECT
2211 E. Missouri Ste. 100
El Paso, Texas 79903
  915-532-3799 (phone)
  915-532-0621 (fax)

By: /s/ Briana Stone
 Briana Stone (*Motion to Appear pending*)
 Texas State Bar No. 24056384
 James C. Harrington (*Motion to Appear pending*)
 Texas State Bar No. 09048500

Wayne Krause (*Motion to Appear pending*)
Texas State Bar No. 24032644

ATTORNEYS FOR PLAINTIFFS

Case 6:07-cv-01045-MV-WPL   Document 1   Filed 10/17/07   Page 18 of 18