UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| BORDER NETWORK FOR HUMAN RIGHTS, LINDA V., SERGIO D., ANGELICA D., DOMITILIA R., FELIPE O., MARIA Q., VERONICA Q., JOSÉ A., and CLAUDIA C. and JOSÉ G., for themselves and their minor children, PERLA G., ANTHONY G., and CLAUDIA G., <br><br>Plaintiffs,<br><br>v.<br><br>COUNTY of OTERO, NEW MEXICO, DEPUTY JASON GREEN, DEPUTY ROB HANSEN, and TWELVE UNNAMED OTERO COUNTY SHERIFF'S DEPUTIES,<br><br>Defendants. | § § § § § § § § § § § § § § § § § § § § § § § | CIVIL ACTION NO.<br><br>07-CV-01045-MV/WPL<br><br><br><br>**JURY TRIAL DEMANDED** |

## PLAINTIFFS' FIRST AMENDED COMPLAINT FOR DAMAGES TO REMEDY CIVIL RIGHTS VIOLATIONS AND COMMON LAW TORTS

Plaintiffs Border Network for Human Rights, Inc., Linda V., Sergio D., Angelica D., Domitilia R., Felipe O., Maria Q., Veronica Q., José A., and Claudia C. and José G., for themselves and their minor children, Perla G., Anthony G., and Claudia G. file this Amended Complaint as of right and pursuant to the Federal Rules of Civil Procedure in that no answer has been filed herein, and would show:

STATEMENT OF CLAIM

1. Plaintiffs bring this civil action for declaratory and monetary relief, seeking redress from Defendants for the deprivation of Plaintiffs' constitutional rights under color of law and in violation of the Fourth and Fourteenth Amendments to the United States Constitution. Plaintiffs

also bring forward supplemental claims for constitutional violations and tortious acts under New Mexico law.

## JURISDICTION AND VENUE

2. This action is brought pursuant to 28 U.S.C. § 1331 and 42 U.S.C. §§ 1983, 1985, and 1988. Plaintiffs also invoke the supplemental jurisdiction of this Court, pursuant to 28 U.S.C. § 1367(a), to hear their state law claims against Defendants. The events which gave rise to this lawsuit occurred within this District making venue proper pursuant to 28 U.S.C. § 1391.

## PARTIES

3. Plaintiff Border Network for Human Rights is a grass roots organization whose mission is to educate border communities regarding civil and human rights with a particular focus on immigrants, and to support immigrants in organizing to assert their rights. It focuses much of its community outreach and organizing efforts in southern New Mexico, including Otero County. A significant portion of its membership resides in Otero County. It brings suit in its representational capacity, on behalf of its members whose rights have been violated by Defendants and whose rights could be violated if Defendants are permitted to continue their policy of racial and ethnic profiling and unreasonable searches and seizures. All of the individually-named Plaintiffs are members of Border Network for Human Rights.

4. Plaintiff Linda V. is Latina and resides in Chaparral, New Mexico. She has four children who reside with her. She brings this action under a pseudonym because she fears that her family will be subjected to retaliation.

5. Sergio D. and Angelica D. are married and are Latinos. Sergio D. is a Legal Permanent Resident and Angelica D. is a U.S. Citizen. They reside together in Chaparral, New

Mexico. They bring this action under pseudonyms because they fear that their family will be subjected to retaliation.

6. Domitilia R. is Latina and resides in Chaparral, New Mexico. She is a U.S. Citizen. She brings this action under a pseudonym because she fears that her family will be subjected to retaliation.

7. Felipe O. is Latino and resides in Chaparral, New Mexico. He is a U.S. Citizen. He brings this action under a pseudonym because he fears that his family will be subjected to retaliation.

8. Plaintiffs Maria Q. and Veronica Q. lived together along with Veronica's children in Chaparral, New Mexico at the time of the incident giving rise to this lawsuit. Maria is Veronica's mother. They are both Latina and now reside in Ciudad Juárez, Chihuahua, Mexico. They bring this action under pseudonyms because they fear that their names would reveal the names of their children and other family members still residing in Chaparral and that their family would be subjected to retaliation.

9. José A. lived with his wife and children in Chaparral, New Mexico when the incidents giving rise to this lawsuit occurred. He is Latino and now resides in Ciudad Juárez, Chihuahua, Mexico. He brings this action under a pseudonym because he fears that his name would reveal the names of his wife, children, and other family members still residing in Chaparral and that his family would be subjected to retaliation.

10. Plaintiffs Claudia C., José G., Perla G., Anthony G., and Claudia G. all lived together in Chaparral, New Mexico when the incident giving rise to this lawsuit occurred. They are all Latinos and Perla G., Anthony G., and Claudia G. are all U.S. Citizens. They now reside in Ciudad Juárez, Chihuahua, Mexico. They bring this under pseudonyms because they fear that

their names would reveal the names of other family members still residing in Chaparral and that their family would be subjected to retaliation.

11. Otero County is a political subdivision within the State of New Mexico. At all relevant times, Otero County employed the deputies described in this complaint. Otero County may be served process by serving County Clerk Robyn Holmes, 1000 New York Avenue, Rm. 108, Alamogordo, New Mexico 88310.

12. At all relevant times, Defendants Green and Hansen as well as the Twelve Unnamed Otero County Sheriff's Deputies were employed by Otero County, and, as such, were responsible for upholding the laws of the United States and New Mexico and acting as the agents, servants, and employees of Defendant County. Defendants Green and Hansen and the Twelve Unnamed Otero County Sheriff's Deputies are sued in their individual and official capacities. Defendants Green and Hansen and the Twelve Unnamed Otero County Sheriff's Deputies may be served with process at Otero County Sheriff's Department, 3208 N. White Sands Blvd., Alamogordo, New Mexico 88310. Although the names of all of the Deputies involved in the incidents giving rise to this suit are not known at this time, they will be identified as litigation and discovery proceeds.

13. At all relevant times, the deputies described herein were employed by Otero County as Deputy Sheriff's Officers. In their actions described herein, the deputies were acting under color of law and pursuant to official policy and custom of Otero County and implementing a county program known as "Operation Stonegarden."

## STATEMENT OF FACTS

14. The staff of Plaintiff organization Border Network for Human Rights has been receiving reports of harassment by Otero County Sheriff's Department against Otero County

residents and members of Border Network for Human Rights who appear to be Latino since January of 2007.

15. However, the habitual harassment of Otero County's Latino residents advanced to a new and unconscionable level this summer when Defendants began targeting Latino families in their own homes by initiating random sweeps of trailers in the area. In so doing, Defendants tossed the Bill of Rights and the Constitution of the State of New Mexico aside and crossed the threshold into the realm of constitutional impermissibility.

16. Some of the earliest examples of Defendants' shocking disregard for Plaintiffs' civil rights were reported in July.

17. One evening on or about July 9, 2007, Plaintiffs Sergio D. and Angelica D. were enjoying a quiet evening at home. Angelica is a U.S. Citizen and Sergio is a Legal Permanent Resident. Angelica was in her living room and Sergio was taking a shower when someone knocked on the door.

18. Angelica opened the door to find Defendant Green standing with his hand already on his gun.

19. Defendant Green told Angelica he was looking for "Tony."

20. Angelica informed him that no one by that name lived there; she purchased the trailer several months earlier.

21. Defendant Green turned to go and Angelica began closing the door.

22. At that moment, Sergio D. emerged from the bathroom where he had been showering.

23. Defendant Green immediately forced the half-closed door open, pushing past Angelica and into the home.

24. On information and belief, Defendant Green did not have a warrant to enter the home or to arrest "Tony."

25. Defendant Green screamed at Angelica with his hand still poised on his gun, "I thought he wasn't here. Let me see your I.D."

26. Angelica said "That's not "Tony." That's my husband, Sergio."

27. Unsure why Defendant Green needed to see her I.D. since she undoubtedly was not "Tony," Angelica nevertheless produced her driver's license.

28. Next, Defendant Green demanded to see Sergio's I.D.

29. Sergio informed Defendant Green that his I.D. was in the bedroom.

30. Defendant Green followed Sergio and shoved him down the hallway leading to the bedroom.

31. Sergio produced his driver's license.

32. When Defendant Green returned to the living room he yelled at Angelica, "I could have you arrested for hiding your husband."

33. "But you didn't ask for him. You asked for Tony," she replied.

34. "Next time I will have you arrested," he threatened, his hand still on his gun.

35. Defendant Green entered Plaintiffs' home without consent or a warrant and in the absence of exigent circumstances. His presence and demeanor frightened Plaintiffs and because they were already in their own home, they felt they could not leave or refuse to answer his questions.

36. More examples of Defendants' custom and policy of ethnic and racial profiling and disregard for the protections of the Fourth Amendment occurred in August 2007.

37. The afternoon of August 8, 2007, Plaintiff Domitilia R. was at home in her trailer talking to her sister Plaintiff Veronica Q. and her mother Plaintiff Maria Q.

38. When Domitilia R. left the trailer she noticed two Otero County Sheriff's deputies approaching the home.

39. One of the deputies asked Domitilia if she had "papers."

40. Domitilia responded that she had "papers" but she did not have them with her.

41. Hearing voices in their yard, Veronica and Maria went outside to investigate.

42. One of the deputies told Veronica and Maria that they had a report that "illegals" were "hiding in trailers." They did not indicate that the report specified Plaintiffs' home.

43. When the deputies arrived, Plaintiff Felipe O., Veronica Q.'s son, was talking to his neighbor in the adjacent yard.

44. When Felipe saw the deputies approach his aunt, mother, and grandmother, he returned to his own yard to see what was going on.

45. When Felipe joined his family one of the deputies asked for his name. Felipe told the deputy his name, but refused the deputy's command to produce his I.D.

46. The deputy asked Felipe, "Are you American?" Felipe replied that he is.

47. Then one of the deputies asked Plaintiffs Veronica Q. and Maria Q. for their I.D.s.

48. Veronica produced a New Mexico I.D. and Maria produced a Texas I.D.

49. After Plaintiffs showed their I.D.s the deputies moved on to a neighboring trailer where another Latino family resided.

50. Plaintiffs saw the deputies take a man and his two children away.

51. Meanwhile, Veronica, Maria, and Felipe went inside.

52. Several minutes later the deputies returned to Plaintiffs' home and entered without knocking.

53. Felipe said, "No. You cannot come in my house. You have to show me a report [warrant]."

54. On information and belief the deputies did not have a warrant to enter Plaintiffs' home or arrest any of their family members. They did not have Plaintiffs' consent to enter, nor were there exigent circumstances at the scene.

55. Felipe demanded, "Show me your report [warrant]."

56. The deputies refused to show Felipe a warrant or evidence that they had received a report about their home.

57. Having barged into Plaintiffs' home without warning, consent, or legal authority, and despite their ability to produce valid identification, the deputies yelled at Veronica and Maria "Show me your papers! Are you Americans? What are your social security numbers?"

58. Veronica and Maria admitted they did not have "papers."

59. Along with their neighbor and his children, Veronica and Maria were taken away by three U.S. Border Patrol agents waiting nearby.

60. As Veronica and Maria were taken away, Plaintiff Domitilia R. returned to her sister and mother's home to make sure Veronica's children were taken care of. As she approached, one of the deputies again asked her whether she had "papers."

61. In the days immediately following their invasion of the Plaintiffs' home, Defendants continued terrorizing Latino families around Chaparral.

62. On the morning of August 8, 2007, Plaintiff José A. was at home looking after his young children while his wife was at work when he heard a knock on his door.

63. When he opened the door an Otero County Sheriff's deputy was standing on his porch.

64. The deputy said, "I heard there were illegals hiding in trailers."

65. José A. said, "No. There aren't many around here."

66. José A. could see a U.S. Border Patrol truck parked on the street nearby.

67. The deputy forced his way into José's home without permission or legal authority. He called the Border Patrol agents waiting outside on his cell phone.

68. Once inside, the deputy asked to see José's I.D. José A. responded that he did not have an I.D., but he was married. He produced his marriage certificate and birth certificate to confirm his identity.

69. The deputy then asked José for his social security number.

70. When the Border Patrol agents arrived they too entered the home without permission.

71. While the deputy and agents waited for José's wife to return home to take charge of the children, his neighbor came over to see what the commotion was about.

72. José's neighbor is an Anglo woman who is a teacher in the local schools, but she too lives in a trailer in Chaparral. The deputy told her that "they were having trouble with drugs."

73. No drugs were found on Plaintiff's property, nor were any drug-related charges brought against Plaintiff.

74. Once again, Defendants burst into a Latino family's home without a warrant or evidence of criminal conduct. This time, however, they added insult to injury by slandering Plaintiff and his family to their neighbor.

75. Just before midnight on that same day, Plaintiff Linda V. was in her home with her family. Her sister was on her way over with her niece.

76. About this time, Defendants Green and Hansen arrived at Linda's house and knocked on the door.

77. When Linda opened the door Defendants claimed someone had called 911 and they asked to come in.

78. Linda said no one called 911; she knew because she had been sitting in the living room where the telephone is located all evening.

79. Just then Linda's sister arrived.

80. As Plaintiff's sister and niece entered, Defendants Green and Hansen pushed their way into Linda's home without permission.

82. Defendants Green and Hansen began searching around the trailer.

83. "What are you looking for?" asked Linda. Defendants refused to answer her questions.

84. Although Plaintiff's home is a small trailer, the two Defendants did not leave until around 1:30 a.m. after an hour and a half of searching and refusing to answer Plaintiff's questions.

85. On information and belief Defendants did not have a warrant or other legal authority to enter or search Plaintiff's home.

86. The next morning, August 9, 2007, Linda returned home from running errands with her children at about eleven a.m.

87. As she went up the steps to her front door, an Otero County Sheriff's patrol car pulled up.

88. Defendants Green and Hansen got out of the car and came up onto Linda's porch. Defendants immediately asked for her I.D.

89. Linda asked Defendants what they were looking for, but again, they refused to answer.

90. One of the Defendants asked, "Are you illegal?"

91. Linda produced her driver's license.

92. At this point Linda's sister came out of the house and Defendants asked for her "papers."

93. Plaintiff's sister produced her driver's license as well.

94. Once the deputies verified Linda's license, Defendants asked for her social security number.

95. Plaintiff admitted she didn't have a social security number.

96. Defendants called the U.S. Border Patrol whose agents were apparently waiting nearby.

97. Defendants would not answer any of Plaintiff's questions or explain why they had come to her home two days in a row to harass her family.

98. Defendants' utter disregard for Plaintiffs' civil rights continued throughout the summer, and Border Network for Human Rights continued to receive complaints from their members varying from harassment to home invasions like those described above.

99. Like all the other named Plaintiffs, on September 10, 2007, José G. was enjoying a normal morning at home with his children when Otero County Sheriff's Deputies came to his door.

100. The deputies asked him if he knew who the stray dogs running around the neighborhood belonged to. José and one of his children said they were not their dogs and they didn't know whose they were.

101. The deputies left. The dogs were taken away in what appeared to be an animal control truck.

102. Several hours later the deputies returned.

103. José's children were playing on the porch when the deputies asked one of them to go get José.

104. When José came to the door the deputies asked him about the stray dogs again.

105. José responded that he had already told them they weren't his dogs and the dogs were already gone.

106. Without warning, the deputies asked for José's I.D.

107. José produced his driver's license.

108. Not satisfied, Defendants demanded to see his social security card as well.

109. Hearing strange voices, José's wife, Plaintiff Claudia C., came to the door.

110. The deputies asked her for her I.D. as well.

111. José could not produce a social security card and Claudia did not have an I.D.

112. When Plaintiffs could not produce the requested documents, one of the deputies muttered, "Go back to your country."

113. The deputies summoned U.S. Border Patrol agents who again were apparently waiting nearby.

114. When José's sister-in-law arrived to take Plaintiffs' three U.S. Citizen children, Perla G., Anthony G., and Claudia G., the deputies assaulted her with questions: "Where are you from? What is your name?"

115. Plaintiff's sister-in-law replied that she is an American Citizen and she came to take the Citizen children.

116. Instead, the deputies insisted that the U.S. Citizen children accompany Claudia to detention and eventually to Juárez despite the fact that their U.S. Citizen aunt was there to care for them.

117. In so doing, the deputies violated the children's right to remain in their country of origin and violated their parents' right to decide the best interest of their own children.

118. Acting without probable cause, reasonable suspicion, or legal justification, the deputies conducted their activities, described above, according to a program of the County, Operation Stonegarden. Moreover, the deputies engaged in illegal racial and ethnic profiling, and also apparently sought to enforce federal civil immigration laws without legal authority to do so.

119. There are any number of such unlawful searches and seizures conducted as part of the County's Operation Stonegarden in Otero County that use pretext to try to enforce federal civil immigration laws or apprehend undocumented immigrants, without legal authority to do so.

120. Operation Stonegarden is implemented by the Otero County Sheriff, who, for purposes of the law, is the same as Otero County. Moreover, the County allows the implementation of Operation Stonegarden, thereby ratifying it.

## CAUSES OF ACTION

### I. Unreasonable Search and Seizure

121. The deputies' actions, stated above, violated Plaintiffs' rights under the Fourth Amendment to the United States Constitution and Article II Sec. 10 of the New Mexico State Constitution.

122. The deputies' actions, done under color of law and official authority and pursuant to official policy and custom, acting with deliberate, conscious and callous indifference to their

rights, deprived Plaintiffs of their right to be free from unlawful search and seizure, and detained them without legal justification.

123. On information and belief, Defendant Otero County and its officials, as a matter of custom and policy, acting with deliberate, conscious and callous indifference to the right to be free from unlawful search and seizure and illegal detention, authorized, tolerated, and institutionalized the practices and ratified the legal misconduct, described herein, as part of Operation Stonegarden, proximately causing Plaintiffs the deprivation of their rights.

## II. Racial and Ethnic Profiling

124. The deputies' actions, stated above, violated Plaintiffs' rights under the Fourteenth Amendment to the United States Constitution and Article II Sec. 18 of the New Mexico State Constitution.

125. The deputies' actions, done under color of law and official authority and pursuant to official policy and custom, acting with deliberate, conscious and callous indifference to their rights, deprived Plaintiffs of their right to equal protection of the law and their right to be free from illegal racial and ethnic profiling and from discrimination on the basis of race or national origin.

126. On information and belief, Defendant Otero County and its officials, as a matter of custom and policy, acting with deliberate, conscious and callous indifference to the right to equal protection of the law and to be free from illegal racial and ethnic profiling and from discrimination on the basis of race or national origin, authorized, tolerated, and institutionalized the practices and ratified the misconduct, described herein, as part of Operation Stonegarden, proximately causing Plaintiffs the deprivation of their rights.

## III. Due Process

127. The deputies' actions, stated above, violated Plaintiffs' rights under the Fourteenth Amendment to the United States Constitution and Article II Sec. 18 of the New Mexico State Constitution.

128. The deputies' actions, done under color of law and official authority and pursuant to official policy and custom, acting with deliberate, conscious and callous indifference to their rights, deprived Plaintiffs of their right to due process of law and their right to be free from false arrest and imprisonment.

129. On information and belief, Defendant Otero County and its officials, as a matter of custom and policy, acting with deliberate, conscious and callous indifference to the right to due process of law and their right to be free from false arrest and imprisonment, authorized, tolerated, and institutionalized the practices and ratified the misconduct, described herein, as part of Operation Stonegarden, proximately causing Plaintiffs the deprivation of their rights.

IV. Civil Conspiracy and Conspiracy to Violate Civil Rights Pursuant to 42 U.S.C. § 1985

130. The Defendant deputies, as described above, conspired to apprehend Otero County residents who they perceived to be undocumented immigrants based on illegal racial and ethnic profiling of Latino families generally, especially those who reside in the innumerable trailers in Otero County.

131. The Defendant deputies, as described above, repeatedly targeted Latino families in Otero County including Plaintiffs by confronting them at their homes without reasonable suspicion or any evidence of criminal conduct other than Plaintiffs' race or ethnicity and Defendants' assumptions about their national origin.

132. The Defendant deputies, as described above, repeatedly forced their way into Plaintiffs' homes without warrants, exigent circumstances, or other legal authority such as evidence of criminal conduct.

133. The Defendant deputies, as described above, illegally searched Plaintiffs' homes and seized Plaintiffs when their presence in Plaintiffs' homes and demeanor prevented Plaintiffs from leaving or refusing to answer Defendants questions.

134. The Defendant deputies conspired to violate Plaintiffs' rights secured in the U.S. and New Mexico Constitutions, including, but not limited to, their rights to equal protection and due process of law.

135. The deputies' actions, done under color of law and official authority and pursuant to official policy and custom, acted with deliberate, conscious and callous indifference to Plaintiffs' rights.

136. Plaintiffs' have been damaged as a result of the wrongful acts Defendant deputies conspired to commit.

137. Violations of Plaintiffs' constitutional rights are damaging to Plaintiffs in and of themselves, but Plaintiffs have also incurred legal costs and other expenses related to the separation of their families.

138. Defendants actions and omissions were the direct and proximate cause of harm to the Plaintiffs.

## V. State Tort Claims

139. Defendants' illegal entry and search of Plaintiffs' homes constitutes trespass.

140. Defendants unlawfully and falsely arrested Plaintiffs Linda V., Maria Q., Veronica Q., José A., Claudia C., José G., Perla G., Anthony G., and Claudia G.

141. The actions of Defendants were not justified or privileged under state law.

## DAMAGES

142. Plaintiffs seek reasonable compensatory and nominal damages against Defendants for violations of their Fourth and Fourteenth Amendment rights as well as their rights under state law.

## PUNITIVE DAMAGES

143. Because of the willful, wanton, and malicious nature of their actions, undertaken against Plaintiffs, in utter disregard for their rights, Plaintiffs, each claim punitive damages against Defendants Green and Hansen and the as yet unknown Otero County Sheriff's Deputies in their individual capacities for their violations of Plaintiffs federal rights.

## ATTORNEYS' FEES

144. Plaintiffs are entitled to recover attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

## DECLARATORY RELIEF

145. This suit involves an actual controversy within the Court's jurisdiction, and the Court may declare the rights of Plaintiffs under the Constitution and laws of the United States, and grant such relief as necessary and proper.

## INJUNCTIVE RELIEF

146. Because Plaintiffs and other Latinos will continue to experience arbitrary and unlawful searches and seizures as well as illegal racial and ethnic profiling and discrimination on the basis of race and national origin as part of Otero County's Operation Stonegarden program, temporary and permanent injunctive relief is necessary to stop such unlawful activity. This is

especially true given the Sheriff's announcement to the press on or about September 17, 2007, that he has plans for more Operation Stonegarden raids in the future.

147. Plaintiffs will suffer irreparable harm, not compensable in monetary damages, if injunctive relief is not granted.

148. Plaintiffs have shown the Court the likelihood of success on the merits of their claim.

## PRAYER FOR RELIEF

Therefore, Plaintiffs respectfully pray that this Court:

A. Enter declaratory judgment that Defendant Otero County and its officials, as a matter of custom and policy, acting with deliberate, conscious and callous indifference to Plaintiffs' rights secured by the Fourth and Fourteenth Amendments authorized, tolerated, and institutionalized the practices and policies behind Operation Stonegarden, and ratified the illegal misconduct herein detailed;

B. Enter declaratory judgment that Defendant Otero County and its officials, as a matter of custom and policy, acting with deliberate, conscious and callous indifference to Plaintiffs' rights secured by Article II Sections 10 and 18 of the Constitution of the State of New Mexico authorized, tolerated, and institutionalized the practices and policies behind Operation Stonegarden, and ratified the illegal misconduct herein detailed;

C. Order injunctive relief requiring Defendants, its agents, servants, and employees, and all persons acting in concert with Defendant, to immediately institute appropriate policies, practices, training and other measures to remedy their policies, practices, and customs and ensure that the constitutional violations described herein cease to occur;

D. Order injunctive relief enjoining Defendants from detaining or arresting Latinos for the purpose of determining their immigration status or facilitating questioning by federal immigration officials; conducting warrantless searches of the homes of Latino families in search of undocumented immigrants; and stopping Latinos on the streets of the town, without reasonable suspicion or probable cause and detaining and interrogating them about their immigration status;

E. Award Plaintiffs actual, compensatory, and punitive damages, in an amount to be determined at trial, against Defendants;

F. Order Defendants to pay Plaintiffs' attorneys' fees and costs;

G.  Award Plaintiffs pre-judgment and post-judgment interest as allowed by law; and

H.  Grant all other and additional relief to which Plaintiffs may be entitled in this action, at law or in equity.

Dated: November 13, 2007

>Respectfully submitted,
>
>PASO DEL NORTE CIVIL RIGHTS PROJECT
>2211 E. Missouri Ste. 100
>El Paso, Texas 79903
>  915-532-3799 (phone)
>  915-532-0621 (fax)
>
>By: /s/ Briana Stone
>Briana Stone (*Pro Hac Vice*)
>Texas State Bar No. 24056384
>Wayne Krause (*Motion to Appear pending*)
>Texas State Bar No. 24032644
>
>*and*
>
>/s/ Olga Pedroza
>Olga Pedroza
>New Mexico State Bar No. 4630
>
>Olga Pedroza, Esq.
>P.O. Box 6342
>Las Cruces, New Mexico 88006
>  505-647-0472 (phone)
>
>ATTORNEYS FOR PLAINTIFFS